Stanley M. JURAS, Plaintiff-Appellant,

v.

AMAN COLLECTION SERVICE, INC.
and Robert A. Gloss,
Defendants-Appellees.

Nos. 84–1923, 84–2356.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 13, 1986.

Decided Sept. 30, 1987.

429 (1976), *replaced by* 20 U.S.C. §§ 1087aa–1087hh (1982 & Supp. III 1985). Juras defaulted on the loans, and MSU assigned the notes to Aman Collection Service (Aman) for purposes of collection on August 2, 1978. Aman ultimately obtained a judgment against Juras in a Montana state court for $5,015.30 on the debt and $1,920.10 in interest and attorneys' fees.

On May 5, 1982, a vice-president of Aman telephoned Juras twice in California before 8:00 a.m. Pacific standard time. On the same day, Aman dispatched a letter to Juras, stating that Aman was in possession of Juras' grade transcripts and would not release them until Juras paid his debt. A subsequent letter stated that Juras would not receive his transcripts even if his debt was discharged in bankruptcy, citing a 1977 case from the Eighth Circuit as authority. The second letter also asserted that the withholding of transcripts was required by federal regulations. Aman later sent a third letter that repeated its position of "no payment, no transcript," and alleged that Juras' lack of cooperation was "forcing us to bring our California counsel into the picture."

Juras filed suit in federal district court on March 21, 1983. His complaint contains ten "counts," each of which alleges several claims. Counts one through five of his complaint address actions taken by Aman before and during its suit in Montana state court and allege that these activities violated numerous sections of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692o (1982 & Supp. III 1985) (the Act). The sixth and seventh counts deal with the phone calls of May 5, 1982, which Juras contends violated not only the federal statute but also California statutes regulating collection agencies and requiring them to be licensed in California in order to conduct business there. Cal.Bus. & Prof.Code §§ 6870, 6871, 6947(d) (West 1984 & Supp. 1987). Counts eight, nine, and ten refer to the three letters sent by Aman, which state that Juras will not receive his transcripts unless he pays his debt, even if the debt is discharged in bankruptcy. Juras complains that the letters themselves and the

Robert E. White, San Francisco, Cal., for plaintiff-appellant.

Christopher J. Rillo, James P. Hargarten and Richard Lapping, San Francisco, Cal., for defendants-appellees.

Before KENNEDY, BOOCHEVER and HALL, Circuit Judges.

PER CURIAM:

Juras, a judgment debtor, appeals pro se the decisions of the district court that (1) refused to permit amendment of his complaint; (2) dismissed several of his causes for action for failing to state a claim under the Fair Debt Collection Practices Act; (3) refused to exercise pendent jurisdiction over his state law claims, and (4) granted judgment, after a jury trial, to the defendant Aman on Juras' remaining claims under the Act. White, appearing as court-appointed counsel for Juras, appeals the district court's award of $8,540 in attorneys' fees against Juras for having brought the action in bad faith and for purposes of harassment. We affirm in part and reverse in part.

## FACTS

Juras attended Montana State University (MSU) from 1972–76. He took out several loans under the National Defense (later "Direct") Student Loan (NDSL) program to finance his education. 20 U.S.C. §§ 421–

withholding of transcripts violate the California and federal statutes mentioned above.

Juras proceeded pro se. Before trial, the district court dismissed the federal claims in counts 1 through 5 and 8 through 10 with prejudice. The court gave no reasons for the dismissals, but apparently considered the first five counts to be barred by the one year statute of limitations found within the Act, 15 U.S.C. § 1692k(d), and believed the last three counts failed to state a claim under the Act. The only federal claims remaining for trial involved the issue of whether the phone calls violated sections 1692c(a)(1) (calling before 8:00 a.m. local time) and 1692d (harassing or abusive conduct). The court refused to exercise pendent jurisdiction over the state law claims because the federal claims no longer predominated. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966).

After the dismissal of most of Juras' claims, he requested appointment of counsel on December 9, 1983. The court denied the motion. Juras then filed a "Notice of Motion and Motion to Amend Previous Order Dismissing Certain Claim [sic], or to Grant New Trial, or to Clarify Previous Order and to Stay Order Pending Appeal, and to Continue Trial Date." In his memorandum in support of this motion, Juras argued that he should be allowed to amend count 5 of his complaint to show newly discovered evidence which indicated that the state court suit was tainted by fraud and therefore in and of itself constituted an unfair debt collection practice. The court denied the motion, and trial was held on January 30–31, 1984. The jury returned a verdict for the defendants on the federal claims involving the telephone calls.

On February 27, Aman made a motion for attorneys' fees pursuant to section 1692k(a)(3) of the Act. The motion was supported by a memorandum and declaration from Aman's attorney, both of which suggest that Juras' purpose in bringing suit was to force MSU to issue transcripts, an improper motivation evidencing bad faith. These documents also point out that

much of Juras' complaint and motions dealt with issues already litigated in the state court action, and that Juras refused to settle for $2,000 before trial, the maximum amount recoverable under the Act for the two violations that went to trial. Juras replied that the settlement offer required that he release his state law claims as well as his federal ones. He also reiterated his contention that the state court action was procured by illegal actions, perjury, and fraud. After oral argument, the district court awarded the fees requested by Aman, $8,540.

## ANALYSIS

### I. *Juras' Claims under the Act*

#### A. *Counts One through Five*

We affirm the district court's dismissal of counts one through five for failure to state a claim and its denial of leave to amend count five. Our reasons are set forth in a separate memorandum decision.

#### B. *Counts Six and Seven*

█ These counts involve the telephone calls Aman made to Juras before 8:00 a.m. Pacific standard time on May 5, 1982. They were tried to a jury, which found for Aman. We must affirm a jury's verdict if it is supported by substantial evidence. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013–14 (9th Cir. 1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

The Act prohibits debt collectors from calling before 8:00 a.m. without prior consent from the consumer, 15 U.S.C. § 1692c(a), and from using the telephone for harassment and abuse. 15 U.S.C. § 1692d(5). However, the Act states that "[a] debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).

Juras admitted that the timing of the calls occasioned "no actual damages." He

presented no persuasive evidence that the contents of the calls were harassing, abusive, or misleading. Gloss testified that Juras received the calls before 8:00 a.m. because Gloss had forgotten to take into account the difference in time zones between California, where Juras lived, and South Dakota, where Aman is located. Gloss also testified that he called Juras in response to Juras' request for a transcript. We conclude that Juras' admission and Gloss' testimony constitute substantial evidence in support of the verdict.

Counts six and seven also contain claims that the telephone calls violated California law. The court refused to exercise pendent jurisdiction over these claims and dismissed them without prejudice. We address this issue in the next section.

### C. *Counts Eight through Ten*

Juras' complaint alleged that withholding his transcript is an unfair method of debt collection under the federal and state statutes. *See* 15 U.S.C. §§ 1692d and 1692f; Cal.Bus. & Prof.Code § 6947(d). It is also asserted that Aman's letters contained false and misleading representations in violation of both federal and state laws. *See* 15 U.S.C. § 1692e; Cal.Bus. & Prof.Code § 6947(d). Finally, it claimed that the letters, like the phone calls, violated the California statute regulating collection agencies. Cal.Bus. & Prof.Code §§ 6870, 6871. We review the dismissal of counts eight through ten de novo. *Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir.1984).

### 1. *Withholding of Transcript*

■ Under federal law, "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Juras claims that withholding his transcript is an unfair means of debt collection because it violates a provision of the NDSL statutes requiring institutions to make loans "without securi-

ty." 20 U.S.C. § 425(b)(5) (1976); 20 U.S.C. § 1087dd(c)(1)(E). We disagree.

The loan statutes do not define the term "security"; the legislative history is equally silent. We therefore turn to more general sources for aid in construing the term.

Standard definitions indicate that the term "security," in the loan context, refers to property belonging to a debtor that provides some assurance of repayment. *See, e.g., Black's Law Dictionary* 1216 (5th ed. 1979); U.C.C. § 1–201(37) (1977). The transcript Juras seeks lacks some of the specified characteristics.

As an initial matter, it is not clear that the transcript is property. In a sense, what Juras seeks is performance of a service, compilation, and delivery of a transcript. Viewed this way, the university's refusal to provide the transcript is akin to a refusal to enroll him for another term, a service it could presumably decline to provide if he failed to repay loans.

Even if the transcript is property, it is unlikely that it belongs to Juras. A property interest is a creation of state law, rule, or policy. *Board of Regents v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In determining whether such an interest exists, Montana looks to its definition of property. *See State ex rel. Ryan v. Norby*, 118 Mont. 283, 165 P.2d 302, 304 (1946). That definition is as follows:

> Property defined—ownership. The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this code, the thing of which there may be ownership is called property.

Mont.Code Ann. § 70–1–101 (1985).

As between Juras and the university, it appears the latter is the owner of the official transcript. It creates, maintains, and possesses the grade record and excludes all others, except the student, from using it.

Juras argues that Montana's public records law gives him an ownership interest in his transcript.[1] His argument, how-

---

1. Montana's public records law states:
(1) Writings are of two kinds:
(a) public; and

    (b) private.
(2) Public writings are:

ever, proves too much, for it gives every Montana citizen ownership of every student's transcript. Far from supporting Juras' claim, the public records law illustrates the difference between ownership and rights of access. Subject to numerous restrictions, the people of Montana enjoy rights of access to public writings, information, parks, and buildings. Because such property is public, however, no individual can own it. For the same reasons, it would appear that Juras has a right of access to his transcript, subject to restrictions imposed by the university, but not an ownership interest in it.[2]

Our conclusion that the transcript is not "security" in the conventional sense, and that the university could therefore withhold it without running afoul of the prohibition in the loan statutes, finds support in the limited case law in this area. *Johnson v. Edinboro State College*, 728 F.2d 163 (3d Cir.1984), holds that a university may withhold a transcript if arrangements to repay the loan or discharge the debt are lacking. The case arises in the bankruptcy context, and the opinion addresses the intricacies of the fresh-start policy. Nevertheless, it endorses the withholding of a transcript in the circumstances of this case. *See id.* at 166.

Our conclusion is also consistent with congressional intent in this area. Though concerned with unfair collection practices, Congress sought vigorous enforcement of the loan laws. *See, e.g.,* 20 U.S.C. § 1087cc (institutions must exercise "due diligence" in collection and must disclose information about defaulting borrowers to Secretary of Education); 11 U.S.C. § 523(a)(8) (1982 & Supp. III 1985) (debtors may discharge student loans in Chapter 7 proceedings within five years of leaving school only if "undue hardship" exists). If Congress' desire for diligent enforcement is to be fulfilled, reasonable enforcement mechanisms, including withholding of transcripts, must be permitted. Dismissal of the claim challenging the withholding of the transcript was proper.

### 2. *Statements in Letters*

■ Dismissal of the claims challenging statements in the letters Aman sent to Juras presents a different issue. Section 1692e of the Act prohibits debt collectors from making "false, deceptive, or misleading representation[s]" in attempting to collect a debt. Claims should not be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987). In this case, dismissal would be proper only if it appeared beyond a doubt that Juras could not identify a false or misleading statement in Aman's letters.

The letter of July 27, 1982, contains two statements sufficient to support a claim under the act:

> I also advised Mr. Schreiber [Juras' former attorney] that if you make a decision to try to discharge this debt in bankruptcy, and if you are successful, transcripts would still not be made available to you

(a) the written acts or records of the acts of the sovereign authority, of official bodies and tribunals, and of public officers, legislative, judicial, and executive, whether of this state, of the United States, of a sister state, or of a foreign country;
(b) public records, kept in this state, of private writings, except as provided in 22–1–1103.
(3) Public writings are divided into four classes:
(a) laws;
(b) judicial records;
(c) other official documents;
(d) public records, kept in this state, of private writings.
(4) All other writings are private.
(1) Every citizen has a right to inspect and take a copy of any public writings of this state, except as provided in 22–1–1103 and as otherwise expressly provided by statute.
Mont.Code Ann. §§ 2–6–101 to 2–6–102 (1985).

2. This case does not present the questions of whether a university may deny its students all information about their grades or whether it may refuse access to official transcripts for any or no reason whatsoever.

due to the Federal Court decision, Giradier [sic] vs. Webster College. Enclosed you will find a copy of Mr. Schreiber's letter to you advising of this decision and noting that I was not quoting "bogus law". To capsulize, I would have to say that my authority is based on Federal case law.

. . . .

We do not expect to gain anything [by withholding your transcripts]. The position is that of the Federal government. We serve as an agent for over 400 institutions that offer Federal loans. It goes without saying that we have to comply with Federal regulations pertinent to these loans. Because of this, the loans are then called in, transcripts are frozen, students are unable to receive employment in their respective fields, and are, therefore, unable to repay the loan—a Catch 22 situation if ever there was one. All you have to do to change this situation is have Congress pass new laws. However, it was due to the tremendous default rate nationwide that some of these laws were enacted.

The first statement is false and misleading as a matter of law. Aman's reliance on *Girardier v. Webster College*, 563 F.2d 1267 (8th Cir.1977), is misplaced. *Girardier* held that a *private* college may withhold the transcripts of a student whose debts have been discharged *under the 1970 amendments to the Bankruptcy Act. Id.* at 1272–77. The holding was based in part on the court's conclusion that the actions of a private college were not state actions. *Id.* at 1273–74 (distinguishing *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), which held that a state violated the Supremacy Clause by refusing a driver's license to a person whose liability for an automobile accident had been discharged in bankruptcy). MSU is a state university. Moreover, the bankruptcy laws underwent wholesale revision in 1978, and every court that has addressed the issue since has held that institutions cannot with-

hold transcripts from students who have had their loans discharged in bankruptcy, who are making payments under a Chapter 13 plan, or who have filed for bankruptcy but not yet received a discharge. *See In re Lanford,* 10 B.R. 132 (Bankr.D.Minn.1981); *In re Howren,* 10 B.R. 303 (Bankr.D.Kan. 1980); *In re Ware,* 9 B.R. 24 (Bankr.W.D. Mo.1981); *In re Heath,* 3 B.R. 351 (Bankr. N.D.Ill.1980); *Lee v. Board of Higher Education,* 1 B.R. 781 (S.D.N.Y.1979); *Handsome v. Rutgers University,* 445 F.Supp. 1362 (D.N.J.1978); *see also Johnson,* 728 F.2d at 163.

The second statement could be construed as false. Our review of the NDSL statute and regulations reveals no legislative authority for Aman's assertion that the withholding of transcripts is required by federal law.

The letter of August 11, 1982, contains a third potentially misleading statement, as follows: "[s]ince it is doubtful that you are willing to cooperate, you are forcing us to bring our California counsel into the picture." Section 1692e(5) specifically forbids threatening "to take any action . . . that is not intended to be taken." If Aman did not intend to employ counsel in California, this threat violated the Act. *Jeter v. Credit Bureau, Inc.,* 760 F.2d 1168, 1175–77 (11th Cir.1985); *Baker v. G.C. Services Corp.,* 677 F.2d 775, 778–79 (9th Cir.1982). The district court erred in dismissing Juras' claims based on these three statements.

### 3. *State Law Claims*

■ The district court dismissed all of Juras's state law claims. These claims require the court to decide whether Aman violated California law by calling and writing Juras there without first obtaining a state license, Cal.Bus. & Prof.Code §§ 6870–6871, and whether the contents of these communications violated state prohibitions against unfair methods of debt collection. *Id.* § 6947.[3] Pendent jurisdiction is a discretionary doctrine. As only two

---

**3.** Section 6947(b) incorporates by reference the federal Fair Debt Collection Practices Act. A violation of the latter is also a violation of the former. The jury's verdict on the telephone

calls would appear to have collateral estoppel effect on some of Juras' state law claims involving the contents of the telephone calls.

claims survived dismissal, the court did not abuse its discretion by refusing to exercise pendent jurisdiction. Our decision revives some of Juras' federal claims. On remand, the district court should reconsider exercising pendent jurisdiction over the state law claims.

## II. *Aman's Claim for Attorneys' Fees Under the Act*

██ Section 1692k(a)(3) of the Act permits the district court to assess attorneys' fees against a debtor "[o]n a finding ... that an action under [the Act] was brought in bad faith and for the purpose of harassment." We review findings of bad faith under the clearly erroneous standard. *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1298 (9th Cir.1982), *cert. denied*, 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982).

The district court awarded Aman attorney's fees without explanation. Aman's appellate brief contends that Juras brought this action to obtain his transcripts and to collaterally attack the Montana judgment. It argues that these goals are improper and claims they evidence bad faith and a desire to harass. Aman also points to Juras' refusal to accept $2,000 in settlement of his claims that survived dismissal as further evidence of his bad faith.

Juras is a contentious and obdurate litigant who is quick to charge conspiracy, perjury, fraud, and judicial bias. He is almost fanatical in his belief that he has been wronged. He is, however, not an attorney. Section 1692k(a)(3) states that a court can assess attorneys' fees against the debtor for *bringing* an action in bad faith. Juras' desire for his transcripts cannot establish bad faith in bringing the action because no decision squarely established that his claim was without merit.

Nor can his refusal to settle or his collateral attacks against the Montana judgment support the award of attorneys' fees. Juras' refusal to settle cannot demonstrate bad faith because in the absence of a specific finding of fact by the district court, we must assume that the settlement offer also included a release of Juras' state law claims, as he alleged during the hearing on the motion for attorneys' fees.

Juras' challenge of the Montana judgment does not establish bad faith because it resulted from understandable confusion about complex legal doctrine. Juras' complaint clearly signaled his intention to challenge the Montana judgment, yet Aman did not raise the defense of res judicata in its answer. After the dismissal of most of his claims, Juras was clearly confused. He was unsure which of his claims survived. He knew he was unequal to the task of litigating the case after the court dismissed most of his claims, and sought appointment of counsel. The court denied his motion, but apparently Juras was not informed of the denial.

We hold that the district court erred in concluding Juras brought this action in bad faith on the basis of his failure to understand and to apply correctly the doctrines of res judicata, collateral estoppel, and equitable relief from judgment. *See Hughes v. Rowe*, 449 U.S. 5, 15, 101 S.Ct. 173, 179, 66 L.Ed.2d 163 (1980) (per curiam) ("An unrepresented litigant should not be punished for his failure to recognize subtle factual or legal deficiencies in his claims.").

## CONCLUSION

The district court did not err in dismissing counts one through five, the claims based on MSU's withholding of Juras' grade transcripts and those attacking the Montana state judgment. Nor did it err in denying Juras' motion to amend his complaint. The jury's verdict on counts six and seven is supported by substantial evidence. The district court, however, did err in dismissing the claims based on the contents of the letters. These claims are remanded to the district court, which should reconsider its decision not to hear Juras' state law claims involving the letters and telephone calls. Finally, we conclude that imposition of attorneys' fees under the Act was clearly erroneous.

Considering the history of this dispute, we wish to make the scope of the remand as clear as possible. Juras may not chal-

lenge his judgment debt to MSU and Aman or MSU's policy of withholding grades from students who have not paid their loans. He may not assert any claim found in counts one through five. He may litigate the claims remaining in counts six and seven to the extent that they are not barred by collateral estoppel and that the district court accepts pendent jurisdiction over the claims based on state law. The claims in counts eight through ten involving allegations of false or misleading statements may be pursued. The state law claims in these counts may be heard at the discretion of the court. Aman may not reassert its claim for attorneys' fees under the Act. The district court may, however, employ its inherent powers and the sanctions available under Rule 11 to ensure that the remand is limited to permissible issues. The court may also wish to reconsider Juras' motion for appointment of counsel.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

BOOCHEVER, Circuit Judge, dissenting in part:

I agree with the opinion except for the holding that withholding Juras' transcript did not violate the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692o (1982 & Supp. III 1985). It is a violation of section 1692e to "threaten to take any action that cannot legally be taken." The NDSL statutes require that institutions make the loans to students "without security." Taking security violates the law, so that using that method to collect a debt constitutes a violation of the Act. Congress included the prohibition against security in the original NDSL statute, see Pub.L. No. 85–864 § 205(b)(5), 72 Stat. 1580, 1585 (1958), and has retained it to the present. See Pub.L. No. 99–498 § 405, 100 Stat. 1268, 1450 (1986).

To resolve Juras' claim that withholding his transcript is an illegal action, we must interpret Congress' intent in prohibiting security for student loans. Unfortunately, as the majority points out, there is scant authority to assist us in this task. The loan statutes do not define "security" and the legislative history is silent on the meaning and purpose of the prohibition against taking security. See H.R.Rep. No. 2157, 85 Cong., 2d. Sess. 31, reprinted in 1958 U.S. Code Cong. & Admin.News 4731, 4761. Here we must apply a term to a situation that probably was not contemplated by anyone when Congress voted on the original or subsequent loan programs. We should look to what we discern as the general purpose of the NDSL legislation and the policies that led Congress to include the provision "without security."

I have also considered the use of the term "security" in the Uniform Commercial Code, generally adopted in all of the states. The U.C.C. defines "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." U.C.C. § 1–201(37) (1977). Under this definition, Juras' entitlement to an official copy of his grades must constitute an interest in personal property in order to qualify as a security interest. I believe that a right of access to the transcript constitutes an interest in personal property, but we need not resolve that question.[1] The scope of the term "security" in the NDSL statutes is undoubtedly broader than interests in personal property and fixtures: universities could not require students to give them deeds of trust on any real property the students might own in order to ensure repayment of NDSL loans.

I believe that Congress used the term in its more basic sense, meaning something that provides "protection," "assurance," or "indemnification." Black's Law Dictionary 1216 (5th ed. 1979). The practice of withholding of transcripts is intended to assure payment of monies due the universi-

---

1. Juras and the university may be joint owners of his transcript. The university does not release transcripts without a written request from the student. Bulletin of Montana State University 24–25 (1976). The student has, therefore, the right to exclude persons other than the university from using it, indicating that he has at least some of the rights of an owner under Montana law. See Mont.Code Ann. § 70–1–101 (1986).

ty. Therefore it is a means of taking security for the loan. This construction is supported by my belief that Congress, in encouraging higher education by generous loan terms, *see* 20 U.S.C. § 425(b) (1976); 20 U.S.C. §§ 1087dd–1087ee (1981), never could have intended the "Catch 22" situation alluded to by Aman: "No payment, no transcript; no transcript, probably no job; no job, no earnings." [CR 9, Ex. F]

The majority states that "Juras has a right of access to his transcript subject to restrictions imposed by the university, but not an ownership interest in it." Even assuming that Juras did not have a property interest in his transcript, the restriction of that right of access to assure loan repayment amounts to taking security for the loan. If the promissory note that Juras executed included a provision that Juras would be denied his right of access to his transcript at any time the loan was in default, such a condition would be for the purpose of securing payment of the loan. The fact that the condition was not written into the loan agreement but contained in a separate policy statement of the university does not alter the fact that it constitutes security for the payment of the loan.

I conclude that a provision conditioning the release of a transcript on payment in full of a NDSL loan constitutes use of the transcript as security for payment of the loan in violation of the loan statutes. Therefore, the threat by a debt collector to withhold the transcript until the student pays his debt is a threat to take an action that cannot legally be taken and violates 15 U.S.C. § 1692e(5) (1982). I do not imply that a university may not withhold transcripts to assure payment of other types of debts. I would hold only that transcripts cannot be withheld to secure payment of NDSL indebtedness.