In re Roland Harry **MACHER**, Debtor.

**United States of America, Appellant,**

v.

**Roland Harry Macher, Appellee.**

No. 00–03659–WSR–11.
Civ.A. No. 7:03CV583.

United States District Court,
W.D. Virginia,
Roanoke Division.

Dec. 2, 2003.

Mark Alan Black, Brumberg Mackey and Wall, Roanoke, VA, for Debtor/Appellee.

John Leslie Brownlee, United States Attorneys Office, Roanoke, VA; and Jason S. Zarin, United States Department of Jus-

tice, Tax Division, Washington, DC, for Appellant.

## MEMORANDUM OPINION

KISER, Senior District Judge.

Before this court is the appeal of the United States ("Government" or "IRS"), pursuant to 28 U.S.C. § 158(a), from an order of the United States Bankruptcy Court for the Western District of Virginia. By a May 29, 2003, order and corrected opinion of June 5, 2003, the Bankruptcy Court directed the United States to process Debtor Macher's offer in compromise as part of his proposed Chapter 11 reorganization plan. The parties stipulated to the relevant facts, and for the reasons stated below, I agree with the legal conclusions and result reached by the Bankruptcy Court. I therefore affirm the Bankruptcy Court's order and direct the IRS to consider Macher's plan. This court is not empowered to dictate that the IRS accept any plan which calls for Macher to pay less than 100% of the IRS's priority claim arising from trust fund taxes improperly diverted by Macher. However, a reasonable reconciliation of internal IRS policy with the "fresh start" policy of the Bankruptcy Code must resist the Government's refusal to process and consider, and its summary rejection of, a Chapter 11 debtor's reorganization plan which proposes a compromise payment of his tax deficiency.

## I. Factual Background

The parties stipulated to the following facts. Roland Macher filed a Chapter 11 petition on November 9, 2000. The Internal Revenue Service holds a priority claim of over $273,000 in payroll taxes Macher collected from employees in trust to pay over to the IRS, but instead diverted to other uses. Macher is now the debtor-in-possession of the underlying business.

Macher's Second Amended Plan provided for the IRS's priority claim to be paid at twenty cents on the dollar at 8% p.a. interest over five years. The IRS filed an objection to the Plan and demanded full payment. At the confirmation hearing, the Assistant United States Attorney representing the IRS advised the Bankruptcy Court that Macher's proposed payment constituted an "offer in compromise" from a debtor in bankruptcy which the IRS would not consider. Section 5.8.3.2.1(1)(B) of the current IRS manual provides: "An offer [in compromise] will not be considered during a bankruptcy proceeding." Though not explicitly stated in the parties' briefs, it appears, and I accept as fact for the purposes of this disposition, that a reorganization of the underlying business is a practical impossibility if the IRS does not compromise its priority tax claim.

In the Bankruptcy Court proceedings, counsel extensively briefed the IRS's stated policy not to consider offers in compromise from debtors in terms of whether it violated (1) Bankruptcy Code § 525 which prevents certain classes of governmental discrimination (such as in licensing and chartering) against persons who are, or have been debtors under the Bankruptcy Act, or (2) the "fresh start" objectives of the Bankruptcy Code.

In its memorandum opinion, the Bankruptcy Court rejected the § 525 grounds for obligating the IRS to consider Macher's offer, a decision neither party questions on appeal. However, the Bankruptcy Court concluded that the IRS could not dismiss Macher's offer in compromise without processing and considering it, as the IRS does with offers in compromise from nondebtors. The Bankruptcy Court reasoned that the IRS policy embodied in IRS Manual § 5.8.3.2.1(1)(B) "directly conflicts with the policies underlying the Bankruptcy Code in general and the reor-

ganization provisions of Chapter 11 in particular" for four reasons.

First, the issue is not whether the debtor can compel the IRS to accept his offer (which he cannot), but whether the IRS at least ought to give a debtor's offer in compromise the same consideration as a nondebtor's offer (which it should). Second, just as a nondebtor's offer does not mean that the taxpayer does not owe the back taxes, but simply that he will be unable to pay them in a reasonable amount of time, the IRS should consider a debtor's offer not as a contention that a portion of the taxes are dischargeable, but simply as a recognition of what he can pay. Third, the IRS's stated policy makes a "fresh start" impossible because a debtor cannot obtain a Chapter 11 discharge of his dischargeable obligations without the IRS's approval of a plan, yet the IRS will not even consider an offer in compromise from a debtor. Fourth, honoring a policy which precludes the government from even entering into negotiations "seems at odds with common sense" and "puts the government at cross-purposes with the beneficial purposes underlying the reorganization provisions of Chapter 11."

With these reasons as its foundation, the Bankruptcy Court entered an order "requiring the United States to process and consider the Debtor's offer in compromise of his tax liabilities." Though the Bankruptcy Court was silent as to the statutory basis on which it founded its decision, the parties on appeal agree that the Bankruptcy Court was invoking its broad equitable powers under 11 U.S.C. § 105(a), which provides that a bankruptcy court "may issue any order, process, or judgment that is necessary to carry out the provisions of this title."

## II.  Analysis of Arguments on Appeal

■ The United States appeals the Bankruptcy Court's ruling on two grounds.

I address each in turn under a *de novo* standard of review. *In re Johnson,* 960 F.2d 396, 399 (4th Cir.1992).

## A.  Jurisdiction of Bankruptcy Court

■ The IRS argues that the Bankruptcy Court exceeded its equitable powers under § 105 because that section's general grant of power and general Bankruptcy Code "fresh start" policy should not defeat the specific balance regarding debtor tax collection made by Congress in § 1129(a)(9) and § 1129(a)(7). In the Government's view, because § 1129(a)(9)(C) requires that 100% of priority tax claims be paid through a Chapter 11 plan while § 1129(a)(7) indicates that non-priority tax claims need not be paid in full, a bankruptcy court is not empowered to upset the congressional balance by requiring the IRS to consider offers in compromise of priority tax claims proposed by a debtor.

■ The Government's contention that it is " 'abundantly clear' from the express language of the Bankruptcy Code that Congress meant to bar confirmation of Chapter 11 reorganization plans that do not pay 100% of priority claims," quoting *Johnson v. Edinboro State College,* 728 F.2d 163, 164 (3d Cir.1984), overstates the policy of § 1129(a)(9) and misconstrues the issue here. Section 1129(a)(9) begins with the qualifier: "Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim . . . ." The strictures of § 1129(a)(9)(C)—that priority tax claims be paid in full and within six years of the date of assessment—apply only if the claimant does not agree to a different treatment. *See 15 Collier on Bankruptcy* ¶ TX4.05[4][c] (Rel.84, Dec. 2002). Therefore, Congress meant to bar Chapter 11 plans only when the claim holder does not agree to an alternative treatment of the claim. To be sure, Con-

gress has denied courts the power to confirm, over the objection of a claim holder, a Chapter 11 plan that does not pay 100% of priority claims within the conditions set by § 1129(a)(9)(C). However, given the introductory qualifier of § 1129(a)(9), the Bankruptcy Code's "fresh start" principle, and the common sense realities of bankruptcy reorganizations, the more reasonable conclusion is that Congress has contemplated a spirit of negotiation in § 1129(a)(9), and not the mechanical refusal by the IRS to consider offers in compromise proposed by debtors.

Indeed, in both its main brief and reply brief the Government indicates that the IRS recognizes the flexibility of § 1129(a)(9) and its authority to compromise priority tax claims. Further, a close reading of the *Johnson* case, which the Government quotes at length, supports the proposition that the holders of non-dischargeable claims retain the flexibility to negotiate with debtors and should consider debtors' repayment proposals.

The IRS states that its practice is to be flexible in negotiating with debtors "under appropriate circumstances." As an example of this flexibility, in its main brief the IRS indicates that when appropriate it will extend the repayment period beyond the six years provided in § 1129(a)(9)(C). In support of this proposition, the Government cites IRS Manual § 25.17.11.5.2(8) which states: "In certain rare cases, a deficient plan may provide the best alternative if collection through liquidation or dismissal would be less that the amount proposed in the plan." This provision indicates that the IRS not only can agree to extend § 1129(a)(9)(C)'s deadline, but that the IRS has the discretion to negotiate a less–than–100% repayment of a priority tax claim. By steadfastly invoking IRS Manual § 5.8.3.2.1(1)(B) to refuse to consider Macher's reorganization plan and arguing that "[p]ayment of 100% of priority taxes is a *statutory prerequisite* to confirmation," the IRS has no way of ascertaining whether liquidation or the proposed compromise is more advantageous.

In its reply brief, the Government cites IRS Manual § 25.17.11.5.2(7) for the proposition that when a Chapter 11 plan proposes less-than-full payment, there is to be no negotiation. IRS Manual § 25.17.11.5.2(7) reads: "If the plan does not meet the minimum requirements for payment under the Bankruptcy Code, or there are other serious concerns, [the IRS employee] should advise the debtor's attorney of the deficiencies and negotiate an acceptable plan. The changes would then be included in an amended plan or in the order confirming the plan." The Government interprets this language as "emphasi[zing]. . . negotiation, not in the sense of compromise, but rather in the sense of expressing a preference to obtain an acceptable plan that meets the requirements of 11 U.S.C § 1129 without resorting to judicial intervention. . . ." In the context of a bankruptcy reorganization, the crabbed definition of "negotiate" as tolerating no compromise alone strains reasonableness; and the Government's interpretative logic ultimately fails by repeating the error of ignoring § 1129(a)(9)'s qualifying language. As shown above, the IRS erroneously takes the "requirements of 11 U.S.C. § 1129(a)(9)" to mandate full payment of its priority claims within six years of assessment. Under a proper reading of § 1129(a)(9)—one that recognizes a claim holders' authority to agree to compromise treatment of their claims in a reorganization plan—the term "negotiate" in IRS Manual § 25.17.11.5.2(7) can recapture its plain meaning of "to confer with another so as to arrive at the settlement of some matter." *Webster's Ninth New Collegiate Dictionary* (1984).

Also in its reply brief, the Government argues that "in this case [the IRS] acted no differently than any other rational priority creditor would" in objecting to the confirmation of a Chapter 11 plan that proposed a 20% payment of its non-dischargeable claim. The IRS's invocation of IRS Manual § 5.8.3.2.1(1)(B) to reject Macher's reorganization plan without considering its terms in light of Macher's financial condition and the liquidation value of the relevant assets is indicative of a reflex action and belies the Government's contention that it was acting "rationally." It may well be that the IRS has determined through repeated dealings with similarly situated debtors that the increased informational, processing, and opportunity costs of considering offers in compromise in Chapter 11 plans exceeds its marginal increase in recuperation through case-by-case determinations, and thus may be considered "rational" in a systemic way. However, the IRS has offered no evidence in this vein, so it is a question I do not reach in this case.

A preference for negotiated settlement over litigation undergirded the *Johnson* decision on which the Government heavily relies in explicating the congressional balance between the Bankruptcy Code's "fresh start" policy and statutes governing collection actions of non-dischargeable claims. In *Johnson,* the debtor argued that the Bankruptcy Code prohibited his school's policy of denying the issuance of diplomas and academic transcripts to bankruptcy debtors who owed non-dischargeable student loans. The Third Circuit disagreed, noting that "it is abundantly clear from both the legislative history and the text of the Bankruptcy Code itself that Congress meant to bar the discharge of educational loans like those Johnson received...." *Johnson,* 728 F.2d at 164. However, in a point the Government fails to note, the college's policy which the

Third Circuit determined was not nullified by the Bankruptcy Code, was to withhold the documents from "students who have made *no payments* on their educational loans, [and] *have not approached the college to arrange a more flexible repayment schedule...." Id.* at 166 (emphasis added). Here, through his reorganization plan, Macher is proposing an alternative repayment schedule that offers a twenty-cents-on-the-dollar payment. Unlike in *Johnson,* Macher has not ignored his debt; rather he is actively trying to negotiate a reorganization within the rules prescribed by the Bankruptcy Code. Therefore, at best the Government's reliance on *Johnson* is misplaced; at worst *Johnson* undercuts the Government's position by suggesting that the Bankruptcy Code contemplates a regime in which creditors negotiate with debtors, and does so even in regards to non-dischargeable claims.

Considering § 1129(a)(9)'s flexibility to compromise priority tax claims, the contradictory policies of the Internal Revenue Manual, and the "fresh start" principle of the Bankruptcy Code, I agree with the Bankruptcy Court's judgment that its equitable powers under § 105 extend to requiring the IRS to at least consider debtors' Chapter 11 plans, and that it was appropriate to order the IRS to process Macher's plan.

## B. Anti–Injunction Act

■ The IRS argues that the Bankruptcy Court's order violates the Anti–Injunction Act of the Internal Revenue Code, which states: "[Except for provisions not relevant here], no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421. In the IRS's view, the Anti–Injunction Act pre-

vents courts from interfering with the assessment and collection procedures of the Internal Revenue Code.

■■■ I am not convinced that a court order directing the IRS to consider a debtor's offer in compromise as it does offers from nondebtors constitutes an injunction under the Anti–Injunction Act. The automatic stay provisions of Bankruptcy Code § 362 apply to priority tax claims held by the IRS, and thus enjoin the IRS from collecting trust fund taxes from debtors. As long as the automatic stay is in place, the Anti–Injunction Act poses no threat to a bankruptcy court's jurisdiction "to enjoin the assessment and/or collection of taxes in order to protect its jurisdiction, administer the bankrupt's estate in an orderly and efficient manner, and fulfill the ultimate policy of the Bankruptcy Act." *Bostwick v. United States*, 521 F.2d 741, 744 (8th Cir. 1975).

Three types of cases highlight the potency of bankruptcy protection, and support the interpretation that the reach of the Anti–Injunction Act does not penetrate an automatic stay: (1) cases outside of bankruptcy in which a party must defeat application of the Anti–Injunction Act in order to avoid financial ruin; (2) cases in bankruptcy, but which concern matters beyond the automatic stay's protection; and (3) cases in bankruptcy involving non-debtor officers of debtor corporations.

The first set of cases is controlled by the Supreme Court case of *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). Though the business in *Enochs* had not yet sought bankruptcy protection, it was undisputed both that the business would be ruined were the Government able to collect all the diverted trust fund taxes owed, and that the owner himself did not have the funds to pay the tax. *Id.* at 2, 82 S.Ct. 1125. Notwithstanding this state of affairs, the Court determined that the Anti–Injunction Act barred courts from enjoining the Government from collecting. *Id.* at 6, 82 S.Ct. 1125 (noting that a suit for an injunction may not be entertained "merely because collection would cause an irreparable injury, such as the ruination of the taxpayer's enterprise"). Here, all the essential facts but one are the same as in *Enochs*. In both cases, a judgment proof owner of a struggling business improperly diverted withholding taxes to operate the business and then sought to enjoin federal tax collection authorities from collecting the full amount due. However, unlike *Enochs*, the present case is in the context of a bankruptcy proceeding, and the Government has not cited, nor I have I been able to locate, a single case that applies the Anti–Injunction Act to restrict a bankruptcy court's ability to administer a bankruptcy estate under § 362 protection.

Illustrative of the second class of cases is *In re Heritage Village Church and Missionary Fellowship ("PTL Club")*, 851 F.2d 104 (4th Cir.1988). The Fourth Circuit in *PTL Club* determined that the Anti–Injunction Act precluded the bankruptcy court from enjoining the IRS from revoking the debtor's tax-exempt status precisely because that status was beyond the reach of the automatic stay. *Id.* at 105. Observing that "[t]here is no express provision in the Bankruptcy Code indicating congressional intent that the Code supersede the Anti–Injunction Act," *id.*, the Fourth Circuit "decline[d] to create an exception to the Act in the absence of express congressional intent." *Id.* at 106. The Fourth Circuit accepted the bankruptcy court's finding that the revocation of the PTL Club's tax-exempt status would terminate all of PTL Club's reorganization efforts, a "harm [that] would certainly justify a preliminary injunction if the court had jurisdiction to issue one." *Id.* Howev-

er, because "revocation of PTL's tax-exempt status [was] not an 'act to collect, assess, or recover' taxes," the automatic stay afforded PTL no protection. *Id.* at 105 (citing 11 U.S.C.A. § 362(a)(6)).

■ Regarding the third set of cases indicating that the Anti–Injunction Act does not penetrate the automatic stay, the IRS correctly notes that the Anti–Injunction Act has been applied to block bankruptcy courts from enjoining the Government's collection attempts from non-debtor individuals when the corporate debtor had misappropriated withholding taxes. *See* 26 U.S.C. § 6672 (providing for a 100% "responsible officer penalty" in such situations). This is as it should be—bankruptcy courts do not have jurisdiction over a debtor corporation's officers. *See In re Pierce Coal & Constr., Inc.,* 49 B.R. 779, 780 (Bankr.N.D.W.V.1985) ("Bankruptcy does not provide a haven for a bankrupt corporate debtor's officers who have failed in their corporate duties."). In *Matter of LaSalle Rolling Mills, Inc.,* the Seventh Circuit relied upon the Anti–Injunction Act to defeat the claim of a debtor-in-possession that the Government should be barred from seeking "responsible officer penalties" from the owners because such penalty would block any possibility that the business could successfully reorganize. 832 F.2d 390, 392 (7th Cir.1987). The court noted the different treatment § 362 gives certain acts by the IRS to conclude that "Congress is capable of creating . . . 'bankruptcy exception[s].'" *Id.* at 394 (noting that § 362(a)(8) applies the automatic stay to actions in the United States Tax Court while § 362(b)(8) indicates that the automatic stay does not apply to "the issuance to the debtor by a governmental unit of a notice of tax deficiency"). Congress has not created an "Anti–Injunction Act exception" to the automatic stay, no court has yet recognized one, and I decline to declare one in this case. The Anti–Injunction Act is indeed a powerful tool in the IRS arsenal, but one could not reasonably maintain, as the Government's logic would lead one to conclude, that it can penetrate a § 362 injunction. When, as here, a § 362 injunction is in place and the IRS has filed a proof of claim against the relevant debtor-in-possession, the IRS must act in accordance with the Bankruptcy Code and the reasonable interpretations of its underlying policy as applied by bankruptcy courts. Thus clear of Anti–Injunction Act-based interference, the Bankruptcy Court's determination that the IRS must process and consider Macher's Chapter 11 reorganization falls within its broad § 105 powers.

### III. Conclusion

The Government relies on the exercise of a *reductio ad absurdum:* Because the IRS cannot be forced to accept less than 100% payment of a priority tax claim, its logic goes, the IRS can refuse to consider debtors' reorganization plans that provide for less than full payment of the claim. This policy not only upends the "fresh start" and rehabilitative goals of bankruptcy, it seals off the IRS from exercising its discretionary authority to negotiate such valid claims under Bankruptcy Code § 1129(a)(9). Therefore, I find that the Bankruptcy Court acted within its authority when it directed the IRS to process and consider Macher's reorganization plan as it would an offer in compromise from a non-debtor. Accordingly, I **AFFIRM** the decision below.

### *ORDER*

This case is before the court on appeal from the United States Bankruptcy Court for the Western District of Virginia. For the reasons stated in the accompanying Memorandum Opinion, the judgment of

the Bankruptcy Court is **AFFIRMED** and the Clerk is directed to dismiss this case from the docket.

The Clerk shall send a copy of this order to counsel of record and the United States Attorney.